LOTTINGER, Judge.
This is a suit by Tony Misita, doing business as Tony Misita Produce Company, against Railway Express Agency, Inc., in the sum of $1,734.15 for alleged damages to sweet peppers, which decayed while in transit with the defendant company.
The record shows that on the morning of June 27, 1949, the petitioner ordered a car from the defendant company to be placed on the loading tracks at Amite, Louisiana. The car was so placed by defendant, and, during the same afternoon petitioner loaded the car with 918 hampers of sweet peppers and ordered' “Standard Refrigeration with 3% salt” for the car.
The car left Amite, destined for Cincinnati, Ohio, at 6:53 p. m. on June 27, 1949: Upon instructions by petitioner the car was diverted twice, first to Chicago and then to Detroit. It was shown that no appreciable time was lost hy these diversions, and the car arrived in Detroit at 10:05 p. m. on June 30, 1949. The consignee inspected the contents of the car on July 1, 1949, and found the peppers to contain 31% soft rot. The consignee refused the shipment, whereupon the defendant company notified petitioner thereof, and was instructed by petitioner, on July 2, 1949, to dispose of the car at best advantage. As July 3rd was a Sunday, and July 4th a holiday, the peppers were not disposed of until July 5, 1949.
Petitioner claims that the decay of the peppers was due to the neglect of defendant in not properly icing them, and claims damages in the sum of $1,734.15. The lower court rendered .judgment for petitioner in the full amount of his claim.' From the said judgment the defendant appeals.
The record shows that the peppers were inspected by an inspector of the U. S. Department of Agriculture prior to their departure from Amite. This inspection was made on July 27, 1949, and showed the peppers to be less than 1% decayed. From the testimony and the inspection report introduced on trial, we believe that it was conclusively shown that the peppers were in good condition just a few minutes prior to their departure.
Mr. Ellzey, the defendant’s agent in Amite, testified that the car in which the peppers were shipped was a relatively new one and was in good condition. . He stated that the car had just been inspected by the company, and that no defects were found. He stated that he called the ice company in Amite, and they loaded the car with ice. Mr. Ellzey did testify, however, that he did not remember inspecting the icing of *102 the car, nor did he check to determine whether same was iced to capacity by the ice company. However, the ice company charged for some 12,900 pounds of ice, which was the capacity loading of the car, and from this fact Mr. Ellzey assumed that the ice bunkers had been filled to capacity. The inspection report of the Department of Agriculture showed the bunkers to be filled at the time of the inspection.
The icing record of the particular car was placed in evidence by defendant. This record shows that, on June 28, 1949, when the car was re-iced at Memphis and the bunkers filled, the vacant space in the bunkers were 42 inches in front and 37 inches in the rear and that 6,000 pounds of ice was required to fill the bunkers. Upon reaching Chicago, according to the said report, it took 7,200 pounds of ice to fill vacancies of 40 inches in front and 40 inches in the rear. Thus, in Chicago, it took 1,200 pounds of ice more to fill one inch of bunker than it did in Memphis, whereas the ice loading capacity of this car was only some 12,900 pounds of ice. Later, in Detroit, the report shows that it took 6,800 pounds of ice to fill 26 inches of vacant space in front and 26 inches in the rear. In other words, it took 800 pounds of ice more to fill an appreciably smaller space in Detroit than it did in Memphis, Either the report of the defendant company is inaccurate, or the car was not iced to capacity at all icing stations as was requested by petitioner when he ordered the car.
Another discrepancy is shown as to the temperature of the car at 12:30 p. m. on July 1, 1949. At that time an inspection report of the Railroad Perishable Inspection Agency shows the temperature of the car to be 60° at the top and 45° at the bottom. However, the report of Mr. Nic-ols, an agent of defendant company whose testimony was taken via interrogatories, shows that, at precisely the same time, the temperature of the car was 50° at the top and 45° at the bottom. We believe that this 10° discrepancy could have dire effects on the preservative conditions of perishable foods.
It was shown without contradiction that a carload of peppers, in good condition, would keep for an average of two weeks under proper icing conditions. The addition of salt would make the peppers hard and adds to their keeping qualities. Mr. Sinagra, who was qualified as an expert, testified that, considering the grade of the peppers in question, they should not have decayed 30% in three days under proper icing conditions.
The defendant company claims that the decay was, caused .by some inherent disease known as bacterial rot. In support of this claim, Mr. Everett, the Division Supervisor for the Railway Express Agency, testified. He stated that one of his duties was the investigation of claims in regard to loss of perishables. He stated that bacterial soft rot will not usually show up until two or three days after the peppers have been harvested. Mr. Everett testified that this was the only case of bacterial rot he had seen in the area this year. Mr. Everett further stated that, had the peppers not been subject to bacterial rot, they would have held up several days under proper icing conditions. He further testified that “standard refrigeration” was “tops in refrigeration.”
Mr. Sinagra, who had been in the produce business some twenty years, and the petitioner, testified that they had never seen any such disease in the vicinity of Amite. Mr. Miller, a fruit and vegetable inspector, testifying for defendant, stated that he had seen some bacterial rot but that he did not know what caused it, nor did he know the effect of refrigeration on bacterial rot. From the testimony of Mr. Miller we believe the bacterial rot must have been rare in the vicinity of Amite, as he seemed to be very unfamiliar with the disease.
 Although the liability of a common carrier for the conditions of perishables is not that of an insurer, the carrier is responsible for furnishing proper refrigeration if and when same is requested by the shipper. The burden of proving proper refrigeration was on the defendant company. Joseph Chalona Co. v. American *103 Ry. Express Co., 11 La.App. 18, 123 So. 147; Atlantic Coast Line v. Georgia Packing Co., 5 Cir., 164 F.2d 1; Delphi Frosted Food Corp. v. Illinois Central R. Co., 6 Cir., 188 F.2d 343.
We believe that the defendant company has failed to sustain their burden of proving proper refrigeration. We base this conclusion on three facts: first, the agent of the company failed in his duty to inspect the car for proper refrigeration prior to departure, but rather assumed the car to be properly iced ¡because the ice company had charged for ice sufficient to fill the bunkers to capacity; secondly, the icing report of the company shows discrepancies which lead this court to conclude that the car was not fully iced at all icifig stations in accordance with petitioner’s instructions of “Standard Refrigeration”;' and third, the 10° variation in tern-* perature in the two reports of 12:30 p. m. of July 1, 1949.
Although the defendant company claimed the peppers to have been affected with bacterial soft rot, it was shown by petitioner, and even by some of defendant’s witnesses, that this particular disease was rare in the vicinity of Amite.
One thing which strikes this court, and which we believe is worthy of note, is the report of the defendant company itself. This report shows that on July 1, 1949, which was five days after the shipment started, the bacterial soft rot of the peppers was 31%. On July 11, 1949, although the shipment had been sold and had been broken, another inspection was made by defendant company. This later inspection showed the bacterial soft rot to be 49%. Thus the defendant’s record shows that although 31% of the peppers decayed during the first five days of refrigeration, only an increase of 18% in decay was sustained during the next ten days. Had the decay been caused by an inherent disease, as defendant claims, it appears that the rate of decay would have increased during this appreciably longer period.
The evidence leads this court to conclude that the unusual decay of these peppers was due-to improper icing conditions. The duty of keeping the peppers under proper icing conditions Was incumbent upon defendant. As the defendant has failed in its duty, it must be held liable for the resulting damages. The lower court, before which the witnesses personally appeared, and which was in a position to weigh their testimony by their responses and actions, chose to hold in favor of petitioner. We find no obvious error in its holdings.
For the reasons assigned, the judgment of the lower court is affirmed, all costs to be paid by defendant.
Judgment affirmed.